NOT DESIGNATED FOR PUBLICATION

No. 127,892

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ALEXANDER JAMES BRAZELLE,
*Appellant*.


MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Submitted without oral argument. Opinion filed July 17, 2026. Affirmed in part, vacated in part, and remanded for resentencing.

*Sean P. Randall*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.


Before BRUNS, P.J., SCHROEDER and GARDNER, JJ.


PER CURIAM: A Shawnee County jury convicted Alexander James Brazelle of one count of rape, one count of aggravated criminal sodomy, and one count of aggravated indecent liberties with a child, all off-grid felonies. The district court then imposed three concurrent life sentences without the possibility of parole for 25 years. Brazelle appeals, challenging his rape conviction, arguing his confession cannot support that conviction. He also challenges his sentence, arguing the district court erred by denying his motion for a downward departure to a grid-based sentence. After careful review, we affirm his rape conviction but vacate his sentence and remand for resentencing.

1

FACTUAL AND PROCEDURAL BACKGROUND

In February 2022, the State charged Brazelle with three off-grid sex crimes—rape, aggravated criminal sodomy, and aggravated indecent liberties with a child—relating to a girl we call "Jane." At the time of the conduct, Jane was under the age of 14 and Brazelle was over the age of 18.

Jane was born with special needs. Because of these special needs, she is "mentally delayed a few years" and has a "very childlike nature." For example, her father opined that when she was 16 years old she mentally functioned more like a 10-year-old.

When Jane was 10 years old, Mother, her husband, and their shared children lived together in Topeka. Jane and her stepsister would stay at Mother's house in an attic bedroom when they visited their respective biological parent there. Brazelle, Mother's sibling, lived at the same house on two occasions, either in the attic bedroom or in the basement.

In late July or early August 2021, Jane, then age 14, told her Mother what had happened to her during her childhood in Topeka. Jane told Mother that while Brazelle had been living with them at the Topeka house, he "decided to put his penis inside my butt." Mother did not believe Jane.

In mid-August 2021, Jane told a school classmate that she had been sexually abused. This prompted the involvement of the Kansas Department for Children and Families. In September 2021, Jane disclosed to Kaitlyn Kuhlman, a child protection specialist with the Department for Children and Families, that Brazelle had inserted his penis into her anus "multiple times when she was around eight or nine" years old.

2

Kuhlman then interviewed Mother, who said that Jane had told her about the abuse a month earlier and that Jane no longer had contact with Brazelle because he had moved out. Kuhlman contacted Topeka Police Department law enforcement who assigned Detective Matt McClimans to investigate the case. Jane then gave a forensic interview and disclosed details of Brazelle's abuse. We find it unnecessary to repeat all those details here.

As part of law enforcement's investigation, McClimans spoke with Brazelle's mother and told her that he was aware Brazelle had spoken with her about Jane's claims. Brazelle's mother said she had met with Brazelle and told him Jane had accused him of "something" and that "none of us want to believe it" and that she did not believe Jane. Brazelle responded, "[M]om don't do that because it did happen." He told his mother that he did not have sex with Jane but that he "got handsy" with her four or five years ago when he was living with his sister and her husband. His mother described Brazelle as "distraught." He told his mom, "Whatever happens. I'm just gonna let it happen . . . because I deserve that." And he kept saying she should believe Jane.

McClimans then interviewed Brazelle at the law enforcement center. The interview was played for the jury at trial. During that interview, Brazelle told McClimans "about six or seven years ago, [he] got a little handsy with [Jane]." Brazelle explained that his "penis never left [his] pants" and he continued, "So there were no sexual relations. But yes, I got handsy with her." Brazelle told the detective that he did not know what gave him the urge to do it and did not understand it. Brazelle confirmed that he had spoken to his mother and told her, "I want you to believe [Jane]" because he "was put through the same thing." Other details will be included in the discussion below, as necessary.

The State charged Brazelle with one count of rape, in violation of K.S.A. 21-5503(a)(3), one count of aggravated criminal sodomy, in violation of K.S.A. 21-

3

5504(b)(1), and one count of aggravated indecent liberties with a child, in violation of K.S.A. 21-5506(b)(3)(A). At trial, eight witnesses, including Father, Mother, Jane, and the investigators, testified. Ultimately, the jury found Brazelle guilty of the three counts charged.

Before sentencing, Brazelle moved for a downward departure to a grid-based sentence and an additional durational departure to half that grid-based sentence. The district court denied his departure motion for reasons that we will address below. The district court then sentenced Brazelle to three life sentences without the possibility of parole for 25 years, under Jessica's Law, to be served concurrently. See K.S.A. 21-6627(a)(1).

Brazelle timely appeals his rape conviction and the denial of his sentencing departure motion.

ANALYSIS

I.    DOES THE CORPUS DELICTI RULE COMPEL REVERSAL OF BRAZELLE'S RAPE CONVICTION?

First, Brazelle argues that under the corpus delicti rule, insufficient evidence supports his rape conviction. He argues that other than his unreliable and uncorroborated confession to Detective McClimans, nothing in the trial record suggests that he committed the crime of rape—there was no physical evidence of rape and Jane never accused him of that crime.

The State responds that under the modified corpus delicti rule, we focus on the trustworthiness of the confession and not on an independent tangible injury to corroborate a confession that supports a conviction. Accordingly, it argues that the totality of the

circumstances and the indicia of reliability of Brazelle's confession show that his confession is sufficient to support his rape conviction.

*The Corpus Delicti Rule*

"Corpus delicti" is Latin for "body of the crime." *State v. Dern*, 303 Kan. 384, 399, 362 P.3d 566 (2015). It is a legal concept derived from 17th century England and "[i]t refers to the existence of an injury (*i.e.*, a death) and a showing that this injury resulted from criminal activity (*i.e.*, a death by homicide)." 303 Kan. at 399. The purpose of the corpus delicti rule is three-fold: "(1) a protection against convicting defendants of imaginary crimes; (2) a means to avoid reliance on false confessions; and (3) a means to promote better police investigations by ensuring that they extend beyond the words of the accused." 303 Kan. at 401.

*Applicable Legal Principles*

A discussion of the intricacies of the corpus delicti rule is necessary before we launch into our standard of review.

The corpus delicti rule primarily protects an accused from being convicted of a crime based on a false confession. *Dern*, 303 Kan. at 399-400. The formal corpus delicti rule prevents convictions based on extrajudicial admissions or confessions unless additional and independent evidence supports the finding that the confessed-to crime occurred. 303 Kan. at 401-02. But the Kansas Supreme Court recognized several problems with this rule because not all crimes produce a tangible injury. So Kansas joined other jurisdictions who have adopted the modified corpus delicti rule, which focuses on the trustworthiness of the confession. 303 Kan. at 408-11.

5

The trustworthiness standard provides "an alternative path for the State to take when making its prima facie showing of the alleged crime's corpus delicti when the nature and circumstances of that crime are such that it did not produce a tangible injury" 303 Kan. at 410. This "alternative route" permits "a trustworthy confession or admission to crimes that do not naturally or obviously produce a tangible injury easily susceptible to physical proof" to provide sufficient evidence of a crime. 303 Kan. at 410.

This trustworthiness standard means that "an 'uncorroborated extrajudicial confession is insufficient to sustain a conviction.'" 303 Kan. at 409-10 (quoting *State v. Tillery*, 227 Kan. 342, Syl. ¶ 2, 606 P.2d 1031 [1980]). But the corroborating evidence "'need not be sufficient, independent of the statements, to establish the corpus delicti.'" 303 Kan. at 406 (quoting *Opper v. United States*, 348 U.S. 84, 93, 75 S. Ct. 158, 99 L. Ed. 101 [1954]). We evaluate the trustworthiness of a confession by the totality of the circumstances. 303 Kan. at 410.

*Standard of Review*

Our standard of review of a corpus delicti challenge is similar to the standard of review we apply to sufficiency of the evidence claims:

"The evidentiary standard for finding a confession or admission sufficiently trustworthy to satisfy the State's obligation to present a prima facie showing of the corpus delicti is akin to the standard of review applicable to sufficiency of the evidence claims— i.e., it asks whether, viewed in the light most favorable to the prosecution, the totality of the circumstances is such that a rational factfinder could, considering all of the evidence, find beyond a reasonable doubt that the charged crime actually occurred. It must be noted that the State carries a higher burden when establishing the corpus delicti through a trustworthy confession than it otherwise would if establishing the corpus delicti through the traditional means of evidence entirely independent of the defendant's statements. [Citations omitted.]" *Dern*, 303 Kan. at 411.

6

*The State's Burden*

Brazelle's conviction of rape under K.S.A. 21-5503(a)(3) required the State to prove that Brazelle engaged in "sexual intercourse with a child who is under 14 years of age." Jane's age is not at issue here. "Sexual intercourse" is statutorily defined as "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 21-5501(a). The district court instructed the jury accordingly.

We set out Brazelle's confession, specific to rape. Brazelle asked Jane to pull her pants down and he "helped her take them off." Brazelle said her pants were halfway down and then he pushed Jane's underwear to the side and caressed her vagina. McClimans asked Brazelle if his fingers ever "[went] inside the line of the vagina." Brazelle answered, "Not in the vagina, but, I did go up and down, the crease, the seam, the line, I guess."

We agree that without Brazelle's statements to McClimans, the evidence is insufficient to establish beyond a reasonable doubt that rape occurred. We have no physical evidence of the rape—the alleged rape did not naturally or obviously produce a tangible injury. No witness testified that rape occurred other than Brazelle's confession, and Jane's testimony did not describe a rape. So the State must establish corpus delicti through a trustworthy confession to this crime. See *Dern*, 303 Kan. at 411-12.

*Application of the* Dern *Factors*

In determining the reliability of a confession, we are guided by this nonexclusive list of factors:

7

"(1) independent corroboration of details or specific facts contained in the confession; (2) the number of times the confession was made and the consistency or lack thereof between different versions of the confession; (3) the circumstances of the confession, including the identity of the person or persons to whom the confession was made and the state of mind of the defendant at the time of the confession; (4) the availability of the facts or details contained in the confession from sources outside the defendant's personal knowledge; (5) the defendant's age, education, experience, and mental health; and, (6) if the confession was made to law enforcement, then the overall fairness of the exchange including whether there was deception, trickery, undue pressure, or excessive length." *Dern*, 303 Kan. at 410-11.

Any one factor may be significant enough to establish trustworthiness. 303 Kan. at 412. We thus assess the trustworthiness of Brazelle's confession using these six factors.

## 1. *Independent Corroboration of Details or Specific Facts in the Confession*

Under the first factor we examine the independent corroboration of details or the specific facts in the confession. See 303 Kan. at 410-11. Brazelle argues that no part of his confession has ever been corroborated and that it was vague. But this mischaracterizes the evidence.

In his interview, Brazelle told McClimans "about six or seven years ago, I got a little handsy with [Jane]." Brazelle told McClimans that Jane was about eight or nine years old when it happened and that he was staying with her mother in the Topeka house. Brazelle stated it happened in the attic bedroom of that house. Jane corroborated her age and the location.

Brazelle's confession went into detail and was not a generalized statement. He recalled dialogue between he and Jane. He discussed how he asked Jane to pull down her

8

pants, which Jane corroborated. He stated he pushed her underwear to the side, which Jane corroborated. He recalled how the two were positioned, which Jane corroborated.

Brazelle's detailed confession discussed his metal state and the "urge" that took over. He explained this touching and said "there was a time where I rubbed my finger, I grazed my finger on her vagina and that was enough. That was when I stopped." In response to questioning, he stated that he touched the skin of her vagina and his finger went in Jane's labia majora, or as he recalled, "Not in the vagina, but, I did go up and down, the crease, the seam, the line, I guess."

Jane told the Safe Talk interviewer that she could not remember if Brazelle's hands went anywhere else on her besides the tight hug. Although she could not specifically remember, she did not deny other touching. She said after Brazelle pulled her pants down he "started going wild," and grabbed her and hugged her hard. Jane stated that this is when Brazelle put his penis in her anus; Brazelle said he merely "dry humped" her.

This happened at the same time and quickly. It is reasonable to believe that Jane could not specifically remember where Brazelle's finger was because he also was humping her from behind. So the fact that Jane could not specifically remember where Brazelle's hands went on her body does not make Brazelle's admission that his fingers entered "the line" of her vagina untrustworthy.

This conclusion is bolstered by Brazelle's statement to his mother that she should believe Jane's allegation against him because he did "get handsy" with her. And he also told the detective so at the beginning of his interview.

The independent corroboration of details and specific facts in the confession weigh in favor of a trustworthy confession.

9

## 2. The Number of Times the Confession was Made and the Consistency or Lack Thereof Between Different Versions of the Confession

The second factor when assessing the trustworthiness of a confession is the number of times the confession was made and the consistency or lack thereof between different versions of the confession. *Dern*, 303 Kan. at 410-11.

Before Brazelle was interviewed by McClimans, Brazelle had spoken to his mother about Jane's allegation. Brazelle's mother told him that Jane had accused him of sexual abuse, but that she did not believe Jane. Brazelle responded, "'Mom don't do that, because it did happen.'" Brazelle confessed to his mother that four or five years ago, when he was living with Jane's mother, he "got handsy" with Jane, but Brazelle denied having sex with her. Brazelle repeatedly told his mother to believe Jane.

During his interview with McClimans, Brazelle confirmed that he had spoken to his mother and told her, "I want you to believe [Jane]." Brazelle confessed, "About six or seven years ago, I got a little handsy with [Jane]." In his interview, Brazelle denied having "sexual relations" with Jane but admitted he "got handsy" with her. His confession included much detail. And during that interview, Brazelle explained the abuse in the same way, except the second time he added that he had "dry humped" Jane.

The initial part of Brazelle's confession to his mother and his later confession to McClimans both stated that he "got handsy" with Jane. And his second recounting of events with McClimans in the same interview matched his first recounting of events with an additional detail added to the beginning and end of the encounter. The fact that Brazelle included more detail in this confession does not negate the fact that he confessed twice to getting "handsy" with Jane.

10

True, Brazelle's confession to his mother does not contain the same amount of detail as does his confession to McClimans. Yet this is unsurprising. When McClimans spoke to Brazelle's mother, she insisted that McClimans not tell her any details about the allegations of sexual abuse, as she was in a difficult position as Brazelle's mother and Jane's grandmother. Because Brazelle's mother refused to hear details about the sexual abuse from McClimans, she likely did not ask Brazelle for any details on how he "got handsy" with Jane.

This factor weighs towards a trustworthy confession.

### 3. *The Circumstances of the Confession*

Third, we consider the circumstances of the confession, including the identity of the person or persons to whom the confession was made and the state of mind of the defendant at the time of the confession. See 303 Kan. at 411.

Brazelle confessed to his mother, when he spoke with her in person, that he "got handsy" with Jane. Brazelle later confessed, in a more detailed fashion, to McClimans when he was interviewed at the law enforcement center. Brazelle claims that his confession to McClimans was inherently coercive because it was made to a law enforcement officer at the law enforcement center where he was "isolated from his friends and family."

Brazelle shows us no case holding that a confession made at police headquarters is inherently coerced because of that location. To the contrary, our analysis of whether a confession is voluntary or coerced does not depend on the location of the confession, but on a variety of other factors. See, e.g., *State v. Barrett*, 309 Kan. 1029, 1042, 442 P.3d 492 (2019) (listing six nonexclusive factors generally considered). "For a confession to be involuntary based on coercive conduct of the State, there must be a link between the

coercive conduct and the confession." *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 7, 106 P.3d 39 (2005). Brazelle shows no such coercive conduct or link here.

Instead, Brazelle asserts that his state of mind tends to show that his confession is untrustworthy. Brazelle argues he has a " history of marijuana use" and that during the interview "his responses and state of mind were affected by his marijuana intoxication." He also argues that he suffered from anxiety and bipolar episodes which undermine the trustworthiness of his confession. Brazelle makes a blanket claim that these types of mental conditions "can affect a defendant's ability to provide free, voluntary, knowing, and thus trustworthy, statements" to law enforcement. But he fails to argue how these mental conditions played a role in his confession or made his confession untrustworthy.

We are unpersuaded. No evidence shows that McClimans was aware of Brazelle's history of marijuana use or that Brazelle mentioned anything to him about drug use. No evidence shows that Brazelle suffered from anxiety or a bipolar episode during their interview, or that McClimans observed any indicators of intoxication. The recording of the confession reveals nothing to suggest that Brazelle was impaired in any way— Brazelle did most of the talking and provided clear and coherent answers to all questions. He had no difficulty understanding McClimans' questions, and he engaged in meaningful and rational conversation with him. Brazelle never requested a break or asked to stop the interview.

Importantly, the district court had examined the voluntariness of Brazelle's confession when Brazelle challenged its voluntariness before trial. The district court held:

> "Based upon the evidence the Court has viewed today, the Court would find that [Brazelle's] statements were voluntarily made without threats or acts of coercion or any— any action by law enforcement that would have caused Mr. Brazelle's will to be overcome by force or fear. The statements would be admissible at trial."

12

The district court addressed the voluntariness of Brazelle's confession a second time when it denied Brazelle's posttrial claim of ineffective assistance of counsel. It reviewed Brazelle's claims of marijuana use, suicidal ideations, high anxiety, and bipolar diagnosis, and concluded that his confession was voluntary:

"Regarding his mental condition, Defendant argues he was 'adversely effected [*sic*] from intoxication due to his use of marijuana.' However, Defendant never mentioned his drug use during the interview and Det. McClimans did not observe any indicators of intoxication. There is no valid argument—and a review of the video does not show—that Defendant's alleged intoxication altered his understanding of his waiver of rights or the questions posited by Det. McClimans. There is no basis to support a finding that his statement should otherwise now be deemed involuntarily given because Defendant may have used marijuana.

"Defendant also maintains he experienced suicidal ideations due to the stress created by the allegations. He also argues he suffered from 'high anxiety,' presumably also as a result from the allegations. It is unclear how his alleged ideations are connected to his interview with Det. McClimans. Similarly, there is not an obvious reason why being anxious means a statement is involuntary. A review of the interview indicates Defendant did most of the talking, with very little questioning by Det. McClimans. Further, while Defendant was emotional, his answers were clear, and he mentioned more than once the regret he felt for his actions.

"Finally, Defendant also mentions his bipolar disorder diagnosis. He makes no clear arguments as to why this diagnosis would render his statements to law enforcement involuntary. However, he cites to *State v. Edwards* to support his claim. 291 Kan. 532, 547, 243 P.3d 683 (2010). In *Edwards*, the defendant 'presented no evidence to establish how bipolar disorder might affect the voluntariness of a sufferer's statements to police.' 291 Kan. at 546-47. The Kansas Supreme Court took issue with Edwards' attempt to enlist the Court "to serve as a mental health expert." *Edwards*, 291 Kan. at 547. Like the Court in *Edwards*, this Court finds that even if suffering from a major depressive bipolar episode during the interview would render Defendant's statement involuntary, he provides zero evidence he was suffering from such an episode during the interview. He certainly never mentioned his bipolar diagnosis to Det. McClimans and Det. McClimans observed nothing to indicate Defendant was not mentally stable to give a statement."

These detailed and persuasive findings relate to the voluntariness of the confession. Yet they also address the circumstances of Brazelle's confession and persuasively show that the conditions were not coercive so as to undermine its trustworthiness. This factor weighs towards the trustworthiness of the confession.

4.  *The Availability of the Facts or Details in the Confession from Sources Outside the Defendant's Personal Knowledge*

Fourth, we assess the availability of the facts or details in the confession from sources outside the defendant's personal knowledge. See *Dern*, 303 Kan. at 411. Here, no facts or details in Brazelle's confession were available from sources outside his personal knowledge, so this factor weighs against trustworthiness.

5.  *The Defendant's Age, Education, Experience, and Mental Health*

Fifth, we consider the defendant's age, education, experience, and mental health. See 303 Kan. at 411.

At the time of his confession, Brazelle was 22 years old and employed. He had no issues remembering his address, phone number, and employer. Brazelle appeared unagitated and relatively relaxed. He explained to the detective that this was not the first time this allegation had been brought to his attention.

Brazelle participated in the interview and answered all questions appropriately. He admitted that he was an emotional and sensitive person, which was reflected in the interview—at times Brazelle became emotional, teared up, and paused, but he was able to collect himself and continue each time. McClimans repeatedly encouraged Brazelle to take his time and acknowledged that this was difficult for him. Brazelle never appeared overwhelmed, withdrawn, or otherwise confused or distressed.

14

We discussed Brazelle's mental health above and found nothing pointing toward the untrustworthiness of his confession. Additionally, toward the end of the interview, McClimans told Brazelle that his mother was worried about his mental state and asked if he had thought about hurting himself. Brazelle responded that ever since he had talked to his mother about the abuse, he felt a lot better about himself and felt less mental distress than before. He said, "As soon as I let it out to my mom, I just felt this like weight, just go."

Nothing about Brazelle's age, education, experience, or mental health establishes that his confession was untrustworthy. This factor weighs towards the confession being trustworthy.

### 6. *The Overall Fairness of the Exchange with Law Enforcement*

Sixth, because one of Brazelle's confessions was made to law enforcement, we assess the overall fairness of that confession, including whether there was deception, trickery, undue pressure, or excessive length. See 303 Kan. at 411.

Brazelle was in the interview room for his confession for approximately 40 minutes, which is not unduly long. Our review of the recorded confession reveals no deception, trickery, or undue pressure during the confession. Contrary to Brazelle's assertion on appeal, law enforcement applied little pressure during the interview. No threats were made by McClimans, who used a calm tone throughout the interview. He explained that Jane claimed that Brazelle had sexually abused her. McClimans told Brazelle that he had spoken with his mother about the allegation and that he wanted to get Brazelle's side of the story, if he were willing to share it. McClimans never rushed Brazelle—he allowed him time to work through his emotions and left once to find a tissue for Brazelle.

15

McClimans never demanded more information from Brazelle. True, he asked clarifying questions about information that Brazelle gave, but the video indicates that he was not forceful with these questions. There was no indication that McClimans did not believe Brazelle. Brazelle started with the general admission that he was "handsy" with Jane and then McClimans asked questions to determine exactly what Brazelle meant by that statement. After Brazelle responded in detail, McClimans asked Brazelle if anything else had happened because McClimans wanted to make sure there was not any "self-preservation" involved. Brazelle then volunteered that he "did dry hump her" and then the two walked through the encounter again, and the two versions matched beyond this addition.

The interview was fair, and the record does not suggest any deception, trickery, undue pressure, or excessive length. See 303 Kan. at 411. So this factor weighs toward trustworthiness.

### *Brazelle's Confession is Sufficiently Trustworthy to Preclude Application of the Corpus Delicti Rule*

In reviewing all the *Dern* factors, five weigh towards trustworthiness and one weighs against it. When viewed in the light most favorable to the State, the totality of the circumstances is such that a rational factfinder could, considering all of the evidence, find beyond a reasonable doubt that the charged rape occurred. Accordingly, we conclude that Brazelle's confession was trustworthy, thus the corpus delicti rule was not violated. Sufficient evidence supports Brazelle's rape conviction, and it is affirmed.

II.   DID THE DISTRICT COURT ERR BY DENYING BRAZELLE'S MOTION FOR A DOWNWARD DEPARTURE?

Next, Brazelle argues that the district court abused its discretion by denying his motion for a downward durational departure. He argued the following factors supported such a departure: (1) his age and immaturity made him less likely to commit offenses in the future; (2) he had no prior convictions; (3) he had a supportive family and community; and (4) he was amenable to rehabilitation.

Brazelle contends that in denying his motion, the district court improperly weighed aggravating factors against mitigating factors. He asserts the district court: (1) made an error of law by improperly weighing the aggravating factor of Jane's age against the mitigating factor of his young age; (2) made an error of fact by failing to consider his lack of criminal history; and (3) reached an unreasonable result.

*Standard of Review and Applicable Legal Principles*

Jessica's Law requires a hard 25 sentence for a defendant who is 18 years of age or older and is convicted of a statutorily enumerated crime—including rape, aggravated criminal sodomy, and aggravated indecent liberties with a child. K.S.A. 21-6627(a)(1)(B)-(D). Yet if it is the defendant's first time being sentenced under Jessica's Law, the district court may sentence the defendant under a departure from the Kansas Sentencing Guidelines Act if "the judge finds substantial and compelling reasons, following a review of mitigating circumstances, to impose a departure." K.S.A. 21-6627(d)(1); see *State v. Powell*, 308 Kan. 895, 902, 425 P.3d 309 (2018).

Under K.S.A. 21-6627(d)(1), the Kansas Supreme Court requires a district court to first review the mitigating circumstances without weighing those circumstances against any aggravating circumstances that may exist. *State v. Jolly*, 301 Kan. 313, 322-23, 342

17

P.3d 935 (2015). Then, the district court must determine whether substantial and compelling reasons exist for a departure. 301 Kan. at 323. Substantial reasons are those that are "'real, not imagined; something with substance and not ephemeral,'" while compelling reasons are those that force the district court to "'leave the status quo or go beyond what is ordinary.'" *Powell*, 308 Kan. at 914.

When making this determination, the district court need not state its reasons for denying a departure motion or recite each step of the legal framework on the record. *Powell*, 308 Kan. at 909-11. But if the district court finds substantial and compelling reasons do exist, the district court must state those reasons on the record. 308 Kan. at 908-09. The district court may consider departure pleadings, listen to the arguments of counsel, and consider victim statements in evaluating a request for a departure. *State v. Plotner*, 290 Kan. 774, 780-81, 235 P.3d 417 (2010).

An appellate court will not reverse a district court's denial of a departure under K.S.A. 21-6627 unless the district court abused its discretion with its ruling. *Powell*, 308 Kan. at 902. "'A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based.'" *Jolly*, 301 Kan. at 325. Brazelle, as the party asserting the district court abused its discretion, bears the burden of demonstrating an abuse of discretion. See *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022). He asserts all three of these grounds as error.

*The District Court Made an Error of Law When Denying Brazelle's Motion for a Downward Durational Departure*

When ruling on a departure motion in a Jessica's Law case, the district court cannot weigh aggravating circumstances against mitigating circumstances, regardless of

18

how rational such weighing may appear to be. See *Jolly*, 301 Kan. at 322. This is because our Supreme Court has held that the plain language of K.S.A. 21-6627(d)(1), which authorizes a durational departure in Jessica's Law cases, makes no reference to aggravating circumstances or factors and instructs the sentencing court to conduct a review of mitigating circumstances without balancing them against the aggravating ones. 301 Kan. at 322-23.

Here, when addressing the first mitigating factor that Brazelle raised—his age— the district court impermissibly weighed the aggravating factors of Jane's age and disabilities against the mitigating factor of Brazelle's age:

> "And the reasons that you state as factors that the Court should consider is one, your age, the age that you were at the time of the offense. And the Court does look to the aggravating factor of the victim's age in this case, as well as the disabilities that you were aware of that she had at the time of this offense. She was 10 years old, and I believe that that would offset, in my mind, the fact that you were of a certain age in respect to that being a mitigating factor. So that—I don't find that there is substantial and compelling reasons for that reason."

This explanation from the district court contradicts the statutory language of K.S.A. 21-6627(d)(1) and caselaw interpreting it.

The Kansas Supreme Court teaches that reversible error occurs in a Jessica's Law departure case: (1) when the sentencing court expressly refers to aggravating factors when ruling; (2) when the court describes its ruling as a product of weighing without referring to aggravating facts; and (3) when the record does not affirmatively show that the district court followed the *Jolly* framework. See *Powell*, 308 Kan. at 906-07. Here, the district court expressly referred to aggravating factors when ruling on Brazelle's departure motion. And the district court judge described its ruling as a product of weighing, stating "I believe that that would offset, in my mind, the fact that you were of a

19

certain age in respect to that being a mitigating factor." This analysis was legally erroneous under our precedent, and thus, an abuse of discretion. See *Jolly*, 301 Kan. at 325.

We thus vacate Brazelle's sentence and remand the case for resentencing in accordance with the *Jolly* framework.

Affirmed in part, vacated in part, and remanded for resentencing.